BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT LALOR, derivatively on behalf of PAYPAL, INC., <br><br> Plaintiff, <br><br> v. <br><br> DANIEL H. SCHULMAN, JOHN D. RAINEY, RODNEY C. ADKINS, JONATHAN CHRISTODORO, JOHN J. DONAHOE, DAVID W. DORMAN, BELINDA J. JOHNSON, GAIL J. MCGOVERN, DEBORAH M. MESSEMER, DAVID M. MOFFETT, ANN M. SARNOFF, FRANK D. YEARY, and WENCES CASARES, <br><br> Defendants, <br><br> and <br><br> PAYPAL HOLDINGS, INC., <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiff Robert Lalor ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant PayPal Holdings, Inc. ("PayPal" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Daniel H. Schulman, John D. Rainey, Rodney C. Adkins, Jonathan Christodoro, John J. Donahoe, David W. Dorman, Belinda J. Johnson, Gail J. McGovern, Deborah M. Messemer, David M. Moffett, Ann M. Sarnoff, Frank D. Yeary, and Wences Casares (collectively, the "Individual Defendants") for violations of federal securities laws, breaches of their fiduciary duties as directors and/or officers of PayPal, unjust enrichment, and waste of corporate assets.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to himself and his acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of PayPal's public documents, transcripts of conference calls and announcements made by PayPal and the Individual Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PayPal news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings in the related federal securities class action lawsuit action filed in this District, captioned *Kang v. Paypal Holdings, Inc., et al.* 3:21-cv-06468 (the "Securities Action"). Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery is afforded.

## NATURE OF THE ACTION

1.     This shareholder derivative action arises on behalf of PayPal against certain of its officers and directors for breach of their fiduciary duties, among other causes of action, to remedy their violations of law which have caused, and continue to cause, substantial harm to PayPal and its shareholders.

2.     PayPal is a digital payments company that enables digital and mobile payments through its platform on behalf of consumers and merchants. The Company's combined payment solutions, including its PayPal, PayPal Credit, Braintree, Venmo, Xoom, iZettle, and Hyperwallet

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

products and services, comprise its Payments Platform. The Company operates a two-sided network that links its customers around the globe to facilitate the processing of payment transactions, allowing it to connect merchants and consumers.

3. This complaint stems from the Individual Defendants and Board of Directors' ("Board") failure to maintain a reasonable reporting system concerning the adequacy of Company's financial reporting and the Company's compliance with applicable laws, both of which were (and are) mission critical to the Company's overall success. Moreover, as described below, PayPal and the Individual Defendants made, and permitted other Individual Defendants to make, false and misleading statements regarding the Company's business practices, including with respect to PayPal Credit – a proprietary online payment service offered by well-known companies, including Wal-Mart, Home Depot, USPS, and eBay.

4. In 2015, PayPal settled regulatory claims with the Consumer Financial Protection Bureau ("CFPB") concerning PayPal Credit business operations between 2011 and 2015. As a result, the Company agreed to pay $15 million in reparations to consumers, a $10 million civil monetary penalty, and to modify its disclosure and related business practices. Thereafter, the Company assured investors that it rectified matters with its PayPal Credit business procedures in compliance with its 2015 CFPB settlement. Nevertheless, such disclosures were deficient, and PayPal continued to downplay its regulatory issues.

5. On July 29, 2021, PayPal filed a Form 10-Q quarterly report that revealed SEC and CFPB investigations. Specifically, PayPal disclosed receipt of a Civil Investigative Demand ("CID") from the CFPB related "to the marketing and use of PayPal Credit in connection with certain merchants that provide educational services"; and that the Company has "responded to subpoenas and requests for information received from the [SEC] relating to whether the interchange rates paid to the bank that issues debit cards bearing [their] licensed brands were consistent with Regulation II of the Board of Governors of the Federal Reserve System and to the reporting of marketing fees earned from the Company's branded card program."

6. On this news, PayPal's stock price fell $18.81 per share, or 6.23%, to close at

3

$283.17 per share on July 29, 2021.

7.     As a result, from at least February 9, 2017 through July 29, 2021 (the "Relevant Period"), the Individual Defendants made materially false and misleading statements and failed to disclose that (i) PayPal failed to remedy and maintained inadequate disclosure protocols and controls; (ii) PayPal's business operations vis-à-vis PayPal Credit continued to be in violation of applicable laws and/or regulations; (iii) PayPal's practices concerning compensation of interchange rates linked to its debit cards were similarly in violation of applicable laws and/or regulations; (iv) PayPal's profits earned from its PayPal Credit and debit card practices were partly the result of inappropriate conduct, and were thus untenable; and (v) all of the aforementioned exposed PayPal to regulatory and enforcement scrutiny.

8.     As a result of the foregoing, PayPal has been named as a defendant in the Securities Action, which alleges investors were damaged when they purchased PayPal shares during the Relevant Period. The Securities Action has subjected the Company to significant damages.

9.     The Individual Defendants knowingly or recklessly breached fiduciary duties and caused other misconduct that substantially damaged the Company. In addition to the costs of defending and potentially paying class wide liability in the Securities Action, the Individual Defendants' wrongful conduct has subjected the Company to costly internal investigations, losses from the waste of corporate assets, losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and reputational harm, among other damages. To make matters worse, during the Relevant Period, when PayPal stock was trading at artificially inflated rates due the false and misleading statements described herein, and while in possession or material, non-public information, certain Individual Defendants sold over $6.25 million worth of Company stock. Through this Action, Plaintiff, on behalf of PayPal, seeks, among other things, to disgorge the illegal profits from these insider sales.

10.     A majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and

independence because there is a substantial likelihood that the Individual Defendants, most of whom are the Company's current directors, are liable in this derivative action and the Securities Action.

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n (the "Exchange Act") and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

12.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

13.     This Court has personal jurisdiction over each defendant named herein because each is either a corporation that conducts business in and maintains operations in this District, is an individual residing in this District, and/or is an individual non-resident who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) PayPal maintains its principal place of business in this District; (ii) one or more of the Defendants either resides in or maintains offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

15.     Plaintiff Robert Lalor is a shareholder of PayPal common stock. Plaintiff has continuously held PayPal common stock since it spun off from eBay Inc. in July 2015.

/ / /

/ / /

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**Nominal Defendant**

16.     Nominal Defendant PayPal is a Delaware corporation with principal executive offices located at 2211 North First Street, San Jose, California 95131.

17.     PayPal's shares trade on the NASDAQ under the ticker symbol "PYPL."

**The Individual Defendants**

18.     Defendant Daniel H. Schulman ("Schulman") has served as the Company's President and Chief Executive Officer ("CEO") at all relevant times. According to the Company's Schedule 14A filed with the SEC on April 13, 2021, (the "2021 Proxy Statement"), Defendant Schulman beneficially owned 364,755 shares of the Company's stock. Based upon the closing price of the Company's stock on March 30, 2021, Defendant Schulman beneficially owned $86,279,147.70 of PayPal stock. For the fiscal year ended December 31, 2020, Defendant Schulman received $23,362,072 in compensation from the company. This includes $1,038,462 in salary, $20,957,193 in stock awards, $1,000,000 in non-equity incentive plan compensation and $366,417 in all other compensation. According to the Company's 2021 Proxy Statement, Defendant Schulman has been "President and Chief Executive Officer of PayPal since July 2015; [and] served as the President and CEO-Designee of PayPal from September 2014 until July 2015."

19.     Defendant John D. Rainey ("Rainey) has served as PayPal's Chief Financial Officer at all relevant times. Rainey also serves as the Company's Executive Vice President of Global Customer Operations. According to the 2021 Proxy Statement, Defendant Rainey beneficially owned 107,845 shares of the Company's stock. Based upon the closing price of the Company' on March 30, 2021, Defendant Rainey beneficially owned $25,509,656.30 of PayPal stock. For the fiscal year ended December 31, 2020, Defendant Rainey received $10,015,110 in compensation from the company. This includes $778,846 in salary, $8,896,739 in stock awards, $328,125 in non-equity incentive plan compensation and $11,400 in all other compensation. According to the 2021 Proxy Statement, Defendant Rainey was also "PayPal's Executive Vice President, Chief Financial Officer, from September 2016 to January 2018.  PayPal's Senior Vice

President, Chief Financial Officer, from August 2015 to September 2016."

20.     Defendant Rodney C. Adkins ("Adkins") has served as a director of PayPal since September 2017. Defendant Adkins serves as a member of the Audit, Risk and Compliance, and Governance Committee ("ADR Committee"). According to the 2021 Proxy Statement, Defendant Adkins beneficially owned 17,843 shares of the Company's stock. Based upon the closing price of the Company' on March 30, 2021, Defendant Adkins beneficially owned $4,220,583.22 of PayPal stock. For the fiscal year ended December 31, 2020, Defendant Adkins received $385,096 in compensation from the company.  This includes $110,000 in fees earned and $275,096 in stock awards.

21.     Defendant Jonathan Christodoro ("Christodoro") has served as a director of PayPal at all relevant times (2015 to present). Defendant Chirstodoro serves as a member of the Compensation and Governance Committees. According to the Company's 2021 Proxy Statement, Defendant Christodoro beneficially owned 24,087 shares of the Company's stock. Based upon the closing price of the Company's on March 30, 2021, Defendant Christodoro beneficially owned $5,697,538.98. For the fiscal year ended December 31, 2020, Defendant Christodoro received $382,685 in compensation from the company. This includes $107,589 in fees earned and $275,096 in stock awards.

22.     Defendant John J. Donahoe ("Donahoe") has served as a director of PayPal at all relevant times (2015 to present). According to the Company's 2021 Proxy Statement, Defendant Donahoe beneficially owned 56,630 shares of the Company's stock.  Based upon the closing price of the Company's common stock on March 30, 2021, Defendant Donahoe beneficially owned $13,395,260.20 of PayPal stock. For the fiscal year ended December 31, 2020, Defendant Donahoe received $455,046 in compensation from the Company. This includes $130,000 in fees earned and $325,046 in stock awards. According to the Company's 2021 Proxy Statement, Defendant Donahoe has been the President and CEO of Nike, Inc. since January 2020.

23.     Defendant David W. Dorman ("Dorman") has served as director of PayPal at all relevant times (2015 to present). Additionally, Defendant Dorman serves as Chair of the

Compensation Committee and is a member of the Governance Committee. According to the Company's 2021 Proxy Statement, Defendant Dorman beneficially owned 43,837 shares of the Company's stock. Based upon the closing price of the Company's common stock on March 30, 2021, Defendant Dorman beneficially owned $10,369,203.00 of PayPal stock. For the fiscal year ended December 31, 2020, Defendant Dorman received $385,096 in compensation from the Company. This includes $110,000 in fees earned and $275,096 in stock awards.

24.     Defendant Belinda J. Johnson ("Johnson") has served as a director of PayPal at all relevant times (2017 to present). Additionally, Defendant Johnson serves on the ADR Committee. According to the Company's 2021 Proxy Statement, Defendant Johnson beneficially owned 17,199 shares of the Company's stock. Based upon the closing price of the Company's common stock on March 30, 2021, Defendant Johnson beneficially owned $4,068,251.46 of PayPal stock. For the fiscal year ended December 31, 2020, Defendant Johnson received $375,096 in compensation from the Company. This includes $100,000 in fees earned and $275,096 in stock awards.

25.     Defendant Gail J. McGovern ("McGovern") has served as a director of PayPal at all relevant times (2015 to present). Additionally, she serves as Chairman of the Governance Committee and as a member of the Compensation Committee. According to the Company's 2021 Proxy Statement, Defendant McGovern beneficially owned 19,141 shares of the Company's stock.  Based upon the closing price of the Company's common stock on March 30, 2021, Defendant McGovern beneficially owned $4,527,612.14 of PayPal stock.  For the fiscal year ended December 31, 2020, Defendant McGovern received $393,096 in compensation from the Company. This includes $118,000 in fees earned $275,096 in stock awards.

26.     Defendant Deborah M. Messemer ("Messemer") has served as a director of Paypal since January 2019.According to the Company's 2021 Proxy Statement, Defendant Messemer beneficially owned 5,359 shares of the Company's stock.  Based upon the closing price of the Company's common stock on March 30, 2021, Defendant Messemer beneficially owned $1,267,617.86 of PayPal stock. For the fiscal year ended December 31, 2020, Defendant

Messemer received $375,096 in compensation from the Company. This includes $100,000 in salary and $275,096 in stock awards.

27.    Defendant David M. Moffett ("Moffett") has served as a director of PayPal since May 18, 2020. Additionally, Defendant Moffett is a member of the Nominating and Corporate Governance Committee. According to the Company's 2021 Proxy Statement, Defendant Moffett beneficially owned 71,988 shares of the Company's stock. Based upon the closing price of the Company's common stock on March 30, 2021, Defendant Moffett beneficially owned $17,028,041.52 of PayPal stock. For the fiscal year ended December 31, 2020, Defendant Moffett received $395,096 in compensation from the Company. This includes $120,000 in salary and $275,096 in stock awards. According to the Company's 2021 Proxy Statement, Defendant Moffett was Lead Independent Director of PayPal, from July 2015 through December 2018.

28.    Defendant Ann M. Sarnoff ("Sarnoff") has served as a director of PayPal since June 2017. Additionally, Defendant Sarnoff serves as a member of the ADR Committee. According to the Company's 2021 Proxy Statement, Defendant Sarnoff beneficially owned 11,551 shares of the Company's stock. Based upon the closing price of the Company's common stock on March 30, 2021, Defendant Sarnoff beneficially owned $2,732,273.54 of PayPal stock. For the fiscal year ended December 31, 2020, Defendant Sarnoff received $375,096 in compensation from the Company. This includes $100,000 in salary and $275,096 in stock awards.

29.    Defendant Frank D. Yeary ("Yeary") has served as a director of PayPal at all relevant times (2015 to present). Additionally, Defendant Yeary serves as a member of the ADR Committee. According to the Company's 2021 Proxy Statement, Defendant Yeary beneficially owned 25,161 shares of the Company's stock. Based upon the closing price of the Company's common stock on March 30, 2021, Defendant Yeary beneficially owned $5,951,582.94 of PayPal stock. For the fiscal year ended December 31, 2020, Defendant Yeary received $375,096 in compensation from the Company. This includes $100,000 in salary and $275,096 in stock awards.

30.    Defendant Wences Casares ("Casares") was appointed as a director in January 2016 and served on the Board until May 2020.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

31. By reason of their positions as officers, directors, and/or fiduciaries of PayPal and because of their ability to control the business and corporate affairs of PayPal, the Individual Defendants owed PayPal and its shareholders' fiduciary obligations of trust, loyalty, good faith, and due care. The Individual Defendants were and are required to use their utmost ability to control and manage PayPal in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of PayPal and its shareholders to benefit all shareholders equitably.

32. Each director and officer of the Company owe PayPal and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

33. As fiduciaries of PayPal, The Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

34. The officers and directors of PayPal were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

35. Each Individual Defendant, under his or her position as a director and/or officer, owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company. As PayPal's directors and officers, the Individual Defendants knowingly acted with reckless disregard of their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

36. The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospect. Moreover, as senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, Individual Defendants had a duty to act in the best interest of the Company. As fiduciaries, the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Individual Defendants had a duty to disclose in its regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

37.     Each of the Individual Defendants further owed PayPal's and the shareholders the duty of loyalty requiring that each favor PayPal's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

38.     At all times relevant hereto, the Individual Defendants were the agents of each other and PayPal and were at all times acting within the course and scope of such agency.

39.     The Individual Defendants had access to adverse, non-public information about the Company because of their advisory, executive, managerial, and directorial position with PayPal.

40.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by PayPal.

**PAYPAL'S CODE OF CONDUCT**

41.     The Individual Defendants, as officers and/or directors of PayPal, were bound by the Company's Code of Business Conduct and Ethics (the "Code"). PayPal deeply values highly ethical principles, such as integrity. The Code states in pertinent part:

**RESPONSIBILITIES OF EMPLOYEES**

You are always expected to use good judgment and act in accordance with the Code, Company policies, and the law. Our Code and Company policies provide the information you need to perform your job ethically, responsibly, and in compliance with the law. This will enable us to attract top talent, create best-in-class products, and uphold our commitment to serve as Customer Champions.

**AS AN EMPLOYEE, YOU ARE EXPECTED TO**:

- Review the Code and Company policies;

11

- Understand the laws that apply to your work;

- Always be honest in your business dealings internally and externally;

- Use good judgement and act in the best interests of the Company;

- Seek guidance whenever you have questions or need advice;

- Speak up and report suspected violations of the Code, Company policies, or the law; and

- Encourage open communication free from the threat of retaliation.

**MAKE ETHICAL DECISIONS**

When you face difficult decisions at PayPal, take the time to think and consider the legal and ethical issues. Don't give in to pressure and don't rush decisions. Listen carefully and consider the implications of your actions.

**ALWAYS ASK**:

- Is it honest and fair?

- Is it consistent with the Code and the law?

- Does it make you feel good about yourself and the Company?

- Would you feel comfortable reading about your decision or action if it is reported in the media? [1]

42.     Additionally, PayPal outlines the roles and responsibilities of managers, specifically:

**RESPONSIBILITIES OF PEOPLE MANAGERS**

Managers have additional responsibilities and serve as role models. Managers lead by example by demonstrating a commitment to acting with integrity every day and ensuring that employees feel comfortable asking for help and raising concerns.

Managers are responsible for acting quickly if there is a suspected violation of the

---

[1] https://s26.q4cdn.com/519805829/files/doc_downloads/Code-of-Business-Conduct-Ethics-2021.pdf

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Code, a Company policy or the law. If an employee reports a suspected violation, managers must be responsive to employee concerns, taking action when it is appropriate and seeking help when needed. We want to create an environment where everyone is encouraged to speak up and report concerns in good faith without fear of retaliation.

**AS A PEOPLE MANAGER, YOU ARE EXPECTED TO: BE A ROLE MODEL AND PROMOTE AN ETHICAL CULTURE**

- Demonstrate the highest ethical standards and quality in your work every day and encourage the same from the people who report to you.

- Create an environment where team members feel comfortable asking questions or raising concerns.

- Do not create or tolerate an environment where team members feel pressured to bend the rules.

- Work hard to innovate and compete in the market and model these behaviors for your team, and never give others the impression that it is acceptable to ignore our Code, Company policies or the law.

**LISTEN AND REPORT PROBLEMS**

- Listen to team members and respond in a way that makes them feel secure and at ease sharing their issues.

- Be proactive and take steps to prevent problems before they happen.

- Be responsible for promptly speaking up.

- Seek guidance from a Business Ethics Officer, People team member, or the Integrity Helpline (http://paypal.ethicspoint.com) if you are unsure about the right thing to do. See page 50 for more information regarding resources and contacts.

**PREVENT RETALIATION**

- Never engage in retaliatory behavior.

- Ensure employees are not subjected to any reprisals for reporting violations.

43.    The Code stated the following regarding accurate recorded keeping:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**MAINTAINING BUSINESS RECORDS**

You are responsible for maintaining official business records in accordance with the Company's records management related policies and retention schedules. This requires:

- Correct recording and reporting of financial data without misleading, misrepresenting, misinforming or omitting important information;

- Preserving all documents relevant to accounting, litigation, government investigations or internal/external audit until otherwise notified by Legal; and

-  Disposing of business records that no longer need to be retained for business reasons.

**ACCURATE ACCOUNTS AND RECORDS**

We have an obligation to our business, shareholders, employees, customers and regulators to ensure that our accounts and business records are complete, accurate, timely and understandable. Business records are critical for internal decision making as well as for reporting to regulators and investors. Maintaining accurate records is consistent with our values and helps establish and maintain our reputation for integrity.

You must never falsify, forge, backdate or improperly alter any Company document. Ever. You must ensure that all transactions are lawful, recorded in the proper account and executed in accordance with all Company internal controls. All disclosures you make to regulatory authorities and investors must be complete, accurate, timely and understandable.

**PAYPAL'S AUDIT, RISK AND COMPLIANCE COMMITTEE CHARTER**

44.     In addition to the above duties, the Defendants, who served on the ADR Committee during the Relevant Period ("ADR Committee Defendants"), owed specific duties to PayPal under the ADR Committee Charter (the "ADR Charter"). The Audit Charter set forth the following responsibilities of the Audit Committee Defendants:

**Financial reporting principles and policies and internal controls and procedures**.

(a) Consider and discuss with the independent auditors any reports or communications (and management's and/or the internal audit department's responses thereto) submitted to the Committee by the independent auditors required by applicable accounting standards;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(b) Confer with the independent auditors, the internal audit team and senior management in separate executive sessions to discuss any matters that the Committee, the independent auditors, the internal audit team or senior management believe should be discussed privately with the Committee;

(c) Review with the Company's Chief Business Affairs and Legal Officer and/or Chief Risk and Compliance Officer, as applicable, any significant legal, compliance or regulatory matters that could have a material impact on the Company's financial statements, business or compliance policies, including material notices to or inquiries received from governmental agencies;

(d) Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential, anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters;

(e) Discuss the types of financial information and earnings guidance (including the use of "pro forma," "adjusted" or other non-GAAP financial measures), and the types of presentations made, to analysts and rating agencies;

(f) Discuss generally disclosure of key performance metrics, including how the measures are calculated or determined, whether they are consistently prepared and presented and how the Company's disclosure controls and procedures relate to disclosure of such measures;

(g) Establish hiring policies for employees and former employees of the independent auditors. These policies shall provide that no former employee of the independent auditors may become the Chief Executive Officer, Chief Financial Officer, Vice President, Risk and Internal Audit, Chief Accounting Officer or Controller (or serve in a similar capacity) if such person participated in any capacity in the Company's audit within the one-year period preceding the date of the initiation of the audit;

(h) Discuss with the independent auditors and management the internal audit department responsibilities, budget and staffing and any recommendations regarding the internal audit department;

(i) Review the significant findings to management prepared by the internal audit department and management's responses;

(j) Discuss earnings press releases;

(k) Discuss the Company's treasury activities (including with respect to its capital structure, investments and cash management) and related risks;

(l) Discuss the Company's tax strategies and related risk.

15

**Reporting and recommendations**.

(a) Prepare the report of the Committee and any other disclosures required by the rules of the SEC to be included in the Company's annual proxy statement and recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K;

(b) Report to the Board on a regular basis and from time to time or whenever it shall be called upon to do so, and make recommendations to the Board as described in this charter and with respect to other matters as the Committee may deem necessary or appropriate;

(c) Consider any reports submitted to the Committee by the independent auditors required by any applicable law or regulation;

(d) Meet with management, the independent auditors and, if appropriate, the Chief Accounting Officer to discuss: the scope of the annual audit, the audited financial statements and quarterly financial statements including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations"; any significant matters arising from any audit, including any audit problems or difficulties, whether raised by management, the internal audit department or the independent auditors, relating to the Company's financial statements; any audit problems or difficulties, including any restrictions on the scope of the independent auditors' activities or access to requested information, and any significant disagreements with management; any critical audit matters; any "management letter" or "internal control" letter issued, or proposed to be issued; any major issues regarding accounting principles and financial statement presentations, including any significant changes to the Company's auditing and accounting principles, policies, controls, procedures and practices, and any major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; analyses prepared by management and/or the independent auditors setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; and

(e) Inquire of the Company's Chief Executive Officer and Chief Financial Officer as to the existence of any significant deficiencies in the design or operation of the Company's internal controls that could adversely affect the Company's ability to record, process, summarize and report financial data, any material weaknesses in internal controls, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

**Compliance Program.**

(a)  Periodically review and approve the Company's enterprise-wide Compliance Program and Global Financial Crimes framework policies, as appropriate;

(b)  Receive and discuss reports on the Company's Annual Risk and Compliance Plans;

(c)  Review and discuss periodic reports from the Chief Risk and Compliance Officer, and other members of management as appropriate, regarding ongoing enhancements to, and overall effectiveness of, the Company's enterprise-wide Compliance Program and the Company's Global Financial Crimes Program;

(d)  Review and discuss compliance risks, the level of compliance risk, management actions on significant compliance matters (e.g., actions taken to remediate significant compliance issues, progress of major compliance initiatives, and remediation progress of open regulatory actions) and reports concerning the Company's compliance with applicable law and regulation;

(e)  Review and discuss significant examination reports from regulatory authorities, or summaries of the same;

(f)  Review and discuss reports on any key organizational changes within the Company to ensure the Company's Compliance function has the appropriate size, skills, stature and independence;

(g)  Review and discuss reports from management regarding significant reported ethics violations under the Company's Code of Business Conduct and Ethics and other corporate governance policies;

(h)  Review and discuss reports on selected compliance topics as management or the Committee deems appropriate;

(i)  Periodically review and approve the Company's Code of Business Conduct and Ethics; and

(j)  Review and discuss all requests for waivers of the Code of Business Conduct and Ethics involving directors, executive officers and executive staff members and make recommendations to the Board as to whether it should approve any such request.[2]

---

[2] https://s1.q4cdn.com/633035571/files/doc_downloads/2021/02/Audit-Risk-and-Compliance-Committee-Charter.pdf

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

45.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

46.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

47.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in deceptive marketing, engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. During the Relevant Period, Individual Defendants collectively and individually initiated a course of conduct that was designed to and did engage in deceptive marketing. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein was a direct, necessary, and substantial participant in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

48.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware

of his or her overall contribution to and furtherance of the wrongdoing.

49.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and PayPal and was at all times acting within the course and scope of such agency.

## **BACKGROUND**

50.     PayPal is a technology platform that facilitates universal digital and mobile payments on behalf of customers and merchants. The Company's services include but are not limited to PayPal Credit and other debit card services. PayPal Credit is an open-end (revolving) credit card account that provides a reusable credit line built into your account, which allows consumers the flexibility to pay for purchases over time. The Company's earns revenue principally by managing customer transactions on "Payments Platform," and other value added services PayPal revenues into the following categories: (i) transaction revenues, which includes net transaction fees charged to consumers and merchants based on the volume of activity processed through the Payments Platform, including PayPal, PayPal Credit, Venmo, Braintree, and Xoom products; and (ii) other value added services, which includes net revenues derived primarily from revenue earned through partnerships, referral fees, subscription fees, gateway fees, and other services provided to merchants and consumers.

51.     On May 19, 2015, The Consumer Financial Protection Bureau (CFPB) brought an action against PayPal and Bill Me Later, Inc. (BML). The CFPB complaint stemmed from PayPal enrolling consumers in PayPal Credit without their consent, prompting consumers to pay for purchases with PayPal Credit although the consumers had explicitly represented that they desired to use a different payment method, neglecting to process consumers' payments swiftly or at all, failing to honor and apply advertised promotional offers, and engaging in other violations of consumer financial laws related to deferred interest and billing.

52.     In May 2015, PayPal settled regulatory claims with the CFPB arising from its credit practices and entered into a Stipulated Final Judgment and Consent Order ("Consent Order") for misconduct that occurred between 2011 and 2015. The Consent Order required

PayPal to pay $15 million in reparation to consumers and a $10 million civil monetary penalty, also and required PayPal to modify its disclosures and related business practices.

53. Leading up to and during the Relevant period, PayPal assured investors of their continued effort to cooperate and engage with the CFPB and to ensure compliance with the Consent Order. PayPal was aware that violation of the Consent Order could result in claims or actions against the Company, including litigation, injunctions, or damage awards.

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

54. On February 8, 2017, PayPal filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 10-K".) The 2016 10-K revealed transaction revenues of 9.49 billion and revenues from other value-added services of $1.352 billion for total net revenues of $10.842 billion for 2016.

55. Furthermore, the 2016 10-K informed investors of PayPal's regulatory duties and associated risks while also assuring investors of PayPal's "compliant solutions" for mitigating such risks. In particular, the 2016 10-K stated, in pertinent part:

> We operate globally and in a rapidly evolving regulatory environment characterized by a heightened regulatory focus on all aspects of the payments industry. That focus continues to become even more heightened as regulators on a global basis focus on such important issues as countering terrorist financing, anti-money laundering, privacy and consumer protection. Some of the laws and regulations to which we are subject were enacted recently and the laws and regulations applicable to us, including those enacted prior to the advent of digital and mobile payments, are continuing to evolve through legislative and regulatory action and judicial interpretation. ***Non-compliance with laws and regulations, increased penalties and enforcement actions related to non-compliance, changes in laws and regulations or their interpretation, and the enactment of new laws and regulations applicable to us could have a material adverse impact on our business, results of operations and financial condition***. Therefore, we ***monitor these areas closely to design compliant solutions for our customers who depend on us.***

(Emphasis added).

56. In addition, PayPal continued to assure investors that the Company was in

compliance with the Consent Order, stating: "[PayPal] continue[s] to cooperate and engage with the CFPB and work to ensure compliance with the Consent Order, which may result in us incurring additional costs."

57.    The 2016 10-K also minimized issues PayPal faced concerning interchange rates, specifically as they related to the United States debit card practices. The 2016 10-K stated in pertinent part:

> In addition, in some jurisdictions, governments have required Visa and MasterCard to reduce interchange fees, or have opened investigations as to whether Visa's or MasterCard's interchange fees and practices violate antitrust law. In the U.S., the ***Federal Reserve Board issued a final rule capping debit card interchange fees at significantly lower rates than Visa or MasterCard previously charged. In the EU, the Multilateral Interchange Fee Regulation limits credit and debit interchange fees for payments and imposes business rules on card processing services.*** Any material change in credit or debit card interchange rates in the U.S. or other markets, including as a result of changes in interchange fee limitations, could adversely affect our competitive position against traditional credit and debit card service providers. Future changes to those regulations could potentially have an adverse effect on our business.

58.    On February 7, 2018, PayPal filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K revealed transaction revenues of $11.402 billion and revenues from other value-added services of $1.692 billion for total net revenues of $13.094 billion for 2017.

59.    The 2017 10-K reiterated the same statements, as referenced above in the 2016 10-K, which include: (i) PayPal emphasizing their satisfactory disclosure procedures and protocol; (ii) purposing to inform investors on regulatory responsibilities, obligations, and "compliance solutions" for resolving such risks; and (iii) outlining PayPal's efforts to comply with the CFPB's 2015 Consent Order.

60.    On February 7, 2019, PayPal filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

31, 2018 (the "2018 10-K"). The 2018 10-K reported transaction revenues of $13.709 billion and revenues from other value-added services of $1.742 billion for total net revenues of $15.451 billion for 2018.

61.     The 2018 10-K reiterated the same statements, as referenced above in the 2016 10-K and 2017 10-K, which include: (i) PayPal emphasizing their satisfactory disclosure procedures and protocol; (ii) purposing to inform investors on regulatory responsibilities, obligations, and "compliance solutions" for resolving such risks; and (iii) outlining PayPal's efforts to comply with the CFPB's 2015 Consent Order.

62.     On February 6, 2020, PayPal filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K revealed transaction revenues of $16.099 billion and revenues from other value-added services of $1.673 billion for total net revenues of $17.772 billion for 2019.

63.     On February 5, 2021, PayPal filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K revealed transaction revenues of $19.918 billion and revenues from other value-added services of $1.536 billion for total net revenues of $21.454 billion for 2020.

64.     The 2020 10-K perpetuated that PayPal has been in compliance with regulatory obligations but failed to disclose during the Relevant Period that the Company had deficient protocols and procedures. In turn, PayPal's Credit was in defiance of applicable rules and regulations.

**THE TRUTH BEGINS TO EMERGE**

65.     On July 29, 2021, PayPal filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the second quarter of 2021. That quarterly report disclosed investigations by the SEC and the CFPB into the Company's PayPal Credit and debit card practices, stating, in relevant part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

We have received a CID from the CFPB related to the marketing and use of PayPal Credit in connection with certain merchants that provide educational services. The CID requests the production of documents, written reports, and answers to written questions. We are cooperating with the CFPB in connection with this CID.

***We have responded to subpoenas and requests for information received from the U.S. Securities and Exchange Commission Enforcement Division ("SEC")*** relating to whether the interchange rates paid to the bank that issues debit cards bearing our licensed brands were consistent with Regulation II of the Board of Governors of the Federal Reserve System, and to the reporting of marketing fees earned from the Company's branded card program. We are cooperating with the SEC in connection with this investigation.

66.     On this news, PayPal's stock price plummeted $18.81 per share (6.23%), closing at $283.17 per share on July 29, 2021.

67.     The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

68.     The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over PayPal Credit and financial reporting.

69.     The Individual Defendants breached their fiduciary duties to PayPal because they willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, Forms 8-K and 10-K, described in this complaint. Defendants signed and authorized the SEC filings that were false and misleading because the Defendants falsely stated/or failed to disclose the following on their watch: (i) PayPal's procedures and protocols with respect to regulatory obligations were deficient (ii) due to these deficiencies, PayPal Credit was in non-compliance regarding applicable rules and regulations; and (iii) PayPal's protocols and procedures regarding payment of interchange rates related to its debit card were likely deficient as well; (iv) therefore, any and all revenues derived

from PayPal Credit and debit card services were the subject of regulatory scrutiny, and thus unfeasible.

## INSIDER TRADING

70. During the Relevant Period, when PayPal stock was trading at artificially inflated rates due the false and misleading statements described herein, and while in possession or material, non-public information, Defendants Schulman, Rainey, and Sarnoff sold over $6.25 million worth of Company stock.

71. On February 16, 2021, Defendant Schulman sold 10,000 shares of Company stock for proceeds of $3,037,500. Defendant Schulman made this sale when PayPal stock was trading at an artificially inflated rate due the false and misleading statements described herein, with knowledge of material, non-public information.

72. On February 17, 2021, Defendant Rainey sold 5,377 shares of Company stock for proceeds of $1,602,346. Defendant Rainey made this sale when PayPal stock was trading at an artificially inflated rate due the false and misleading statements described herein, and with knowledge of material, non-public information.

73. On February 16, 2021, Defendant Sarnoff sold 5,290 shares of Company stock for proceeds of $1,605,462. Defendant Sarnoff made this sale when PayPal stock was trading at an artificially inflated rate due the false and misleading statements described herein, and with knowledge of material, non-public information.

74. Plaintiff, on behalf of PayPal, is entitled to disgorge these illegal profits.

## DAMAGE TO PAYPAL

75. As a direct and proximate result of the Individual Defendants' conduct, PayPal will lose and expend many millions of dollars. These damages include, but are not limited to, legal fees associated with the Securities Action, related internal investigations, and lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

76. As a direct and proximate result of the Director Defendants' conduct, PayPal has

also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

77.     Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

78.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

79.     Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

80.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

81.     Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

82.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants.

83.     Because of the facts set forth throughout this Complaint, demand on the Company's Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

84.     The Company's Board is currently comprised of twelve members–Adkins, Christodoro, Donahoe, Dorman, Johnson, McGovern, Messemer, Moffett, Sarnoff, Schulman, and Yeary (collectively, the "Director Defendants") along with Enrique Lores ("Lores") who is not a defendant in these proceedings (collectively, the "Directors"). Thus, Plaintiff is required to

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

show that a majority of the Directors, *i.e.*, six, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

85.     Demand is excused as to each of the Director Defendants because each faces, individually and collectively, a substantial likelihood of liability as a result of the conduct alleged herein. Each approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

86.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

87.     The Director Defendants were aware of the PayPal Credit misconduct during the Relevant Period, including because accompanying SBPC letters (including the August 27, 2020 letter) were addressed to Defendant Schulman.

88.     Additionally, Director Defendants Schulman, Donahoe, Dorman, Johnson, McGovern, Moffet, and Yeary signed the Company's 2016 10-K, which acknowledged the Company's obligation to cap credit interchange fee pursuant to the Rules of the Federal Reserve Board. Notwithstanding, these Defendants permitted the Company to violate these rules and/or failed to ensure the Company maintained internal controls sufficient to ensure the Company's compliance therewith.

89.     Additionally, each of the Directors received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendants Schulman and Rainey**

90.     During the Relevant Period, when PayPal stock was trading at artificially inflated

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

rates due the false and misleading statements described herein, and while in possession of material, non-public information, Director Defendants Schulman and Sarnoff sold nearly $5 million worth of Company stock. These sales demonstrate a motive to participate and to personally benefit from the fraud, and that both Directors face a substantial likelihood of liability.

**Defendants Moffett, Adkins, Johnson, Messemer, Sarnoff, and Yeary**

91.     Defendants Moffett, Adkins, Johnson Messemer, Sarnoff, and Yeary are not disinterested or independent, and therefore, are incapable of considering demand because they all serve as members of the ADR Committee and, therefore, are ADR Defendants. Pursuant to the ADR Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, accounting, legal, regulatory, and public disclosure requirements.  Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements related to PayPal's insufficient disclosures regarding procedures and protocol regarding compliance with the Consent Order.

92.     As ADR Defendants, these directors were entrusted with reviewing and discussing compliance risks and management activities related to Consent Order compliance, yet they failed to perform their commitments. ADR Defendants throughout the Relevant Period allowed PayPal to make substantial misstatements regarding the Company's failure to comply with the Consent Order. These significant misstatements to investors generated the impression that PayPal made organizational restructuring adjustments to ensure that the Company's compliance function was suitable when it was not. Due to such inaccuracies in compliance disclosures, PayPal Credit too was not in compliance, subjecting PayPal to more regulatory scrutiny.

93.     As such, the ADR Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

**Defendants McGovern, Adkins, Christodoro, and Dorman**

94.     Defendants McGovern, Adkins, Christodoro, and Dorman served on the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Corporate Governance Committee, and as part of their duty was required to provide a review, guidance, and oversight for the overall operations of a corporation or business.

95.     For these reasons, Defendants McGovern, Adkins, Christodoro, and Dorman breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

**Defendant Donahoe**

96.     Defendant Donahoe is not disinterested or independent, and therefore, is incapable of considering demand because, as Independent Chair, he was responsible for clear leadership of the Board, ensuring its effectiveness in all aspects, including that it functions effectively. Defendant Donahoe allowed the board to act in an unproductive manner because, as Independent Chair, he was privy to information related to non-compliance regarding the Consent Order and PayPal Credit.

97.     Defendant Donahoe allowed the Company to assert material misstatements regarding PayPal's regulatory obligations, which created a disparate imbalance between the interests of management and the Company's shareholders.

98.     In addition, as Independent Chair, Defendant Donahoe sets the ethical tone for the Board and PayPal. He permitted other board members to engage in unscrupulous conduct and did not maintain balance in the board room.

99.     For these reasons, Defendant Donahoe breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

100.     The Directors, as members of the Board, were and are subject to the Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Conduct requires the Directors to also adhere to PayPal's standards of business conduct. The Directors did not comply with the requirements of the Code of Conduct.  The Directors violated the Code of Conduct because they knowingly or recklessly engaged in and facilitated the misconduct alleged herein and participated in making

28

and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Directors violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

101. Furthermore, demand, in this case, is excused because the Directors, who are named as defendants in this action, control the Company and are indebted to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand for the Directors would be futile.

102. PayPal has been and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for PayPal any part of the damages PayPal suffered and will continue to suffer, thereby. Thus, any demand for the Directors would be futile.

103. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

104. The acts complained of herein constitute violations of fiduciary duties owed by PayPal's officers and directors, and these acts are incapable of ratification.

105. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability

insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of PayPal. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of PayPal, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

106. If there is no directors' and officers' liability insurance, then the Directors will not cause PayPal to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

107. Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM
**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

108. Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

109. The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

110. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that

[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

111.    Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

112.    Under the Direction and watch of the Individual Defendants, the 2019 Proxy Statement contained false and misleading statements and failed to disclose that (i) PayPal failed to remedy and maintained inadequate disclosure protocols and controls; (ii) PayPal's business operations vis-à-vis PayPal Credit continued to be in violation of applicable laws and/or regulations; (iii) PayPal's practices concerning compensation of interchange rates linked to its debit cards were similarly in violation of applicable laws and/or regulations; (iv) PayPal's profits earned from its PayPal Credit and debit card practices were partly the result of inappropriate conduct, and were thus untenable; and (v) all of the aforementioned exposed PayPal to regulatory and enforcement scrutiny. Further, the 2021 Proxy was false and misleading because it contained references to the Code of Conduct, which were not followed.

113.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2019 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to the matters set forth for shareholder determination in the 2019 Proxy Statement, including, but not limited to, election of directors.

114.    The false and misleading elements of the 2019 Proxy Statement led to the re-election of Defendants Adkins, Casares, Christodoro, Donahoe, Dorman, Johnson, McGovern,

Messemer, Moffett, Sarnoff, Schulman, and Yeary, which allowed them to continue breaching their fiduciary duties to PayPal.

115. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2019 Proxy Statement.

116. Plaintiff has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

117. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

118. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of PayPal's business and affairs.

119. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of PayPal.

120. The Individual Defendants made, or permitted other Individual Defendants to make, materially false and misleading statements concerning, and failed to disclose that (i) PayPal failed to remedy and maintained inadequate disclosure protocols and controls; (ii) PayPal's business operations vis-à-vis PayPal Credit continued to be in violation of applicable laws and/or regulations; (iii) PayPal's practices concerning compensation of interchange rates linked to its debit cards were similarly in violation of applicable laws and/or regulations; (iv) PayPal's profits earned from its PayPal Credit and debit card practices were partly the result of inappropriate conduct, and were thus untenable; and (v) all of the aforementioned exposed PayPal to regulatory and enforcement scrutiny.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

121. In breach of their fiduciary duties owed to PayPal, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

122. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of PayPal's securities.

123. The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of PayPal's securities.

124. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

125. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, PayPal has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. Plaintiff on behalf of PayPal, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Unjust Enrichment

126.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

127.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of PayPal.

128.     Each of the Defendants received payment from PayPal in the form of either salary or director fees while actively breaching their fiduciary duties to PayPal.

129.     Further, Defendants Schulman, Rainey, and Sarnoff breached their fiduciary duties by utilizing material, non-public information to sell over $6.25 million worth of Company stock during the Relevant Period, when PayPal stock was trading at an artificially inflated rate due the false and misleading statements described herein. Plaintiff, on behalf of the Company, seeks to disgorge these illegal profits.

130.     All the payments and benefits provided to defendants were at the expense of PayPal. The Company received no benefit from these payments.

131.     Plaintiff, as a shareholder and a representative of PayPal, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties. Plaintiff on behalf of PayPal, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

132.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

133.     As a result of the foregoing, and by failing to properly consider the interests of

the Company and its public shareholders, the Individual Defendants have caused PayPal to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to sell PayPal stock during the Relevant Period, while the stock price was artificially inflated due to the false and misleading statements and omissions that the Individual Defendants made and/or caused the Company to make, and to lose assets from investors and customers who no longer trust the Company.

134. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

135. Plaintiff on behalf of PayPal, has no adequate remedy at law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of PayPal and that Plaintiff is a proper and adequate representative of the Company;

B. Awarding money damages in an amount exceeding $75,000 against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

C. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

D. Directing PayPal to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect PayPal and its stockholders from a repeat of the damaging events described herein;

E. Awarding punitive damages;

F. Awarding costs and disbursements of this action, including reasonable

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

attorneys', accountants', and experts' fees; and

**G.**    Granting such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Respectfully submitted,

Dated: January 19, 2022          By:     */s/ Rachele R. Byrd*
                                          RACHELE R. BYRD

                                          BETSY C. MANIFOLD (182450)
                                          RACHELE R. BYRD (190634)
                                          ALEX J. TRAMONTANO (276666)
                                          **WOLF HALDENSTEIN ADLER**
                                           **FREEMAN & HERZ LLP**
                                          750 B Street, Suite 1820
                                          San Diego, CA 92101
                                          Telephone: (619) 239-4599
                                          Facsimile: (619) 234-4599
                                          manifold@whafh.com
                                          byrd@whafh.com
                                          tramontano@whafh.com

                                          **MOORE KUEHN, PLLC**
                                          Justin A. Kuehn
                                          Fletcher W. Moore
                                          30 Wall Street, 8th floor
                                          New York, New York 10005
                                          Tel: (212) 709-8245
                                          jkuehn@moorekuehn.com
                                          fmoore@moorekuehn.com

                                          **RIGRODSKY LAW, P.A.**
                                          Seth D. Rigrodsky
                                          Timothy J. MacFall
                                          Vincent A. Licata
                                          825 East Gate Boulevard, Suite 300
                                          Garden City, NY 11530
                                          Tel: (516) 683-3516
                                          sdr@rl-legal.com
                                          tjm@rl-legal.com
                                          vl@rl-legal.com

                                          *Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT